# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

PEGGY A. GARDENHIRE,        )
     Plaintiff,           )
                           )
     v.                     )        CAUSE NO.: 2:05-CV-88-PRC
                           )
JO ANNE B. BARNHART,       )
Commissioner of the Social Security    )
Administration,            )
     Defendant.         )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 4], filed by the Plaintiff, Peggy A. Gardenhire, on March 7, 2005, and a Memorandum in Support of Summary Judgment or Remand [DE 20], filed by the Plaintiff on September 26, 2005. The Plaintiff seeks judicial review of a final decision of the Defendant, the Social Security Administration, in which the Plaintiff was denied Disability Insurance Benefits ("DIB"). For the following reasons, the Court **DENIES** the Plaintiff's request to reverse and remand the decision of the Commissioner.

## PROCEDURAL BACKGROUND

The Plaintiff filed an application for DIB and Supplemental Security Income ("SSI") on June 26, 2001, alleging disability since May 16, 2001. Her application was denied initially on October 18, 2001, and again upon reconsideration on March 12, 2002. On April 11, 2002, the Plaintiff filed a request for a hearing, which was first held on June 4, 2003, before Administrative Law Judge ("ALJ") Bryan Bernstein.[1] Because the Plaintiff was without counsel, ALJ Berstein continued the case to afford Gardenhire time to obtain counsel. On January 7, 2004, the Plaintiff appeared, *pro*

---

[1] Although the Plaintiff's opening brief repeatedly refers to this hearing as being held on January 4, 2004, the record reflects that the date of the hearing with ALJ Bernstein was June 4, 2003. (R. at 22.)

*se*, before ALJ Steven Neary.[2]  At the January 7, 2004 hearing, the Vocational Expert ("VE")

Leonard Fischer testified.  On July 28, 2004, the ALJ issued a decision finding that, although the

Plaintiff had severe impairments[3], she nevertheless was not disabled within the meaning of the

Social Security Act because she retained the residual functional capacity ("RFC") to do a moderate

range of jobs in the economy.  In the decision, the ALJ made the following findings relevant to the

DIB determination:

> (1) The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

> (2) The claimant has not engaged in any substantial gainful activity since the alleged onset of disability.

> (3) The claimant's plantar fascitis, depression, and anxiety are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

> (4) These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

> (5) The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

> (6) The claimant has the following residual functioning capacity to perform light work, performing postural activities only on an occasional basis, but no work involving repeated hand use, public contact, or close proximity to co-workers.

---

[2] Hereinafter, unless otherwise specified, "ALJ" refers to ALJ Neary with regard to the January 7, 2004 hearing.

[3] Pursuant to 20 C.F.R. § 404.1520(c), a "severe impairment" is an impairment that significantly limits a claimant's ability to perform basic work activities.

(7)     The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(8)     The claimant is 42 years old, considered a "younger individual" (20 C.F.R. §§ 404.1563 and 416.964).

(9)     The claimant has a "high school (or high school equivalent) education" (20 C.F.R. §§ 404.1564 and 416.964).

(10)    The claimant has no transferrable skills from semi-skilled work previously performed as described in the body of the decision (20 C.F.R. §§ 404.1568 and 416.968).

(11)    The claimant has the residual functioning capacity to perform a significant range of light work (20 C.F.R. §§ 404.1567 and 416.967).

(12)    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. at 18-19.)  On January 7, 2005, the Appeals Council denied the Plaintiff's request for review.

## FACTS

### A. Background

At the time of the January 7, 2004 hearing, the Plaintiff was 43 years old.  She was 5'6" tall and weighed 244 pounds.  She received her high school diploma in 1979.  Although the Plaintiff was attending Illinois University to be a radiology technician at the time of the hearing, she has since dropped out of school.  Her past relevant work consists of work as a telemarketer, cashier, inspector,

3

pharmacy technician, and assembler.  The Plaintiff alleges that she became disabled on May 16, 2001, as a result of depression, anxiety, diabetes, arthritis, and carpal tunnel syndrome.

## B. Medical Evidence

### I.  Mental Impairments

The earliest mental health records from the administrative record are from Dr. Gracilea Hernandez, M.D., a physician at Saint Margaret Mercy Healthcare Center.  On April 24, 1993, the Plaintiff was admitted for seventy-two (72) hour emergency detention because her family said that she was "depressed and paranoid."  (R. at 140.)  On the day of her admission, she told a counselor that she had been having suicidal thoughts.  Upon being evaluated in the emergency room and after signing herself as voluntary admission, the Plaintiff ran out of the hospital and had to be restrained by security personnel, whom she scratched and bit.  Her family then petitioned for involuntary commitment.  After a nine-day stay, the Plaintiff was discharged with a diagnosis of a major depressive disorder, unspecified with psychosis; overweight; left conjunctivitis secondary to trauma; and nonspecific lower back pain.  At this time, her doctor placed her on Zoloft, of which she currently takes two hundred (200) milligrams per day.

Since the 1993 episode and subsequent commitment, the Plaintiff has had repeated bouts of depression and paranoia, for which she has sought treatment from Dr. Sudhir Gakhale, M.D., a psychiatrist in Oaklawn, Illinois.  From approximately 1993 through July 1998, Dr. Gakhale provided medication and individual psychotherapy.  There are no medical records from Dr. Gakhale in the administrative record.  In approximately the summer of 1998, the Plaintiff ceased treatment from him due to a lack of insurance coverage.

On March 2, 2000, the Plaintiff began a course of treatment at Southlake Center for Mental Health ("Southlake").  According to the "intake narrative", she reported that she was very

4

overwhelmed with her thoughts, and that her mind felt like it was in a "chronic brain cramp."  (R. at 178.)  She reported that, in February 2000, she was fired from her job as a telemarketer, which has caused her to feel intense nervousness.  She alleged that her superior, when she worked as a telemarketer, was "watching me, listening to me" and her company "didn't want me to use their dental insurance." (R. at 178.)  She also admitted to throwing papers at her boss and cursing at him when she was fired.  The Plaintiff's Global Assessment of Mental Functioning ("GAF") at the time of this appointment was 60.

On March 27, 2000, the Plaintiff underwent a psychiatric evaluation by  Dr. Natalia Fudim, M.D., a staff psychiatrist at Southlake.  She complained that she felt tired all of the time and that she "d[idn't] have a grip on life."  (R. at 196.)  Dr. Fudim noted that the Plaintiff was "quite tearful throughout the session" and that she appeared depressed.  (R. at 197.)  Dr. Fudim also noted that there was a paranoid theme present in the Plaintiff's feeling that people were jealous of her and that these people were perhaps responsible for her losing jobs in the past.  The Plaintiff's GAF at the time of the evaluation was 45.

On April 12, 2000, during an one-hour therapy session with Dr. Ginger Wegner at Southlake, the Plaintiff complained that she could not recall details of the day and that she felt criticized and left out by family members.

On April 13, 2000, Dr. Fudim reported that the Plaintiff's crying spells had decreased and that she reported feeling better.  She informed Dr. Fudim that, since her last visit, she obtained employment as a pharmacy technician and was inquiring into obtaining another position as a pharmacy technician at the Hammond Clinic.

On July 25, 2000, during another one-hour therapy session with Dr. Wegner, the Plaintiff stated that although she received a favorable review on her job performance, she still felt that

co-workers were trying to hold her back and keep her from being more successful.  The Plaintiff also reported that she was diagnosed with diabetes and that she felt better with an increase in Zoloft.  Her GAF at this appointment was 60.

On April 6, 2001, the Plaintiff returned to Southlake for a psychotherapy session on her Major Depressive Disorder.  Dr. Fudim noted that she was quite overwhelmed and tearful at the visit.  He increased her Zoloft prescription to 100 milligrams per day.

On June 8, 2001, during another psychotherapy session at Southlake with Dr. Fudim, the Plaintiff reported that she had been fired and that she was depressed due to the firing and problems with her son.  Dr. Fudim increased her Zoloft from 100 milligrams to 150 milligrams per day and ordered her to return in one month.

On July 6, 2001, the Plaintiff returned to Southlake for another psychotherapy session and Dr. Fudim increased her Zoloft to 200 milligrams per day.

On August 28, 2001, the Plaintiff underwent a psychiatric evaluation at Southlake with Kristina Kruchowski, a clinical nurse specialist.  The Plaintiff stated that she felt stressed and overwhelmed because of her unemployment.  She also admitted to intermittent suicidal ideation within the last couple of months, and that she had thought about harming others, but no one in particular.  Kruchowski noted that she appeared unhappy and slightly anxious.  Kruchowski continued the 200 milligrams of Zoloft per day and initiated 0.5 milligrams of Klonopin, in order to target her residual symptoms of anxiety.  Kruchowski diagnosed the Plaintiff with a GAF of 55.

On September 26, 2001, Dr. Patrick J. McKian, Ph.D, a clinical psychologist, performed a mental status examination on the Plaintiff.  Dr. McKian reported that the Plaintiff had a history of depression and that she had been fired from a number of jobs because of personal problems with coworkers.  The Plaintiff informed Dr. McKian that she had some memory problems, feelings of

depression, and difficulty standing because of the pain in her feet.  Dr. McKian noted that while talking about losing employment, the Plaintiff exhibited some "paranoid traits as she always saw [losing her job] as being someone else's fault and that people were against her."  (R. at 218.)  Dr. McKian diagnosed the Plaintiff with recurring major depression and a panic disorder without agoraphobia.  He also determined that she had a GAF of 55.

On October 10, 2001, Dr. W. Shipley, Ph.D., a State agency Psychiatrist, performed an examination of the Plaintiff.  Dr. Shipley found the Plaintiff to have no severe impairments, but found that she suffered from affective and anxiety-related disorders.  Dr. Shipley diagnosed the Plaintiff with mild limitations on her daily activities and social functioning, and on maintaining concentration, persistence, or pace.

On October 30, 2001, in written documents accompanying her master treatment plan, the Plaintiff reported that she felt harassed by people using pink pens if they saw her using one.

On November 26, 2001, Kruchowski and Dr. John Kern, M.D., medical director at Southlake, observed that the Plaintiff appeared psychiatrically stable and in no acute distress.  In her four subsequent visits, stemming from December 17, 2001 through March 25, 2002, Kruchowski and Dr. Kern reported similar positive findings regarding the Plaintiff appearing psychiatrically stable and in no acute distress.

On March 28, 2002, Kim Johnson, a staff social worker at Southlake, observed that Gardenhire appeared to be experiencing a complex grief reaction with her brother's suicide.  The Plaintiff also reported that she found out that her ex-husband molested her son when he was five years-old on more than one occasion.  When the Plaintiff indicated her desire to limit miscellaneous appointments, Johnson responded that if she did not see the Plaintiff in April, 2002, her case would be closed.

On April 22, 2002, during a psychotherapy session with Kruchowski and Dr. Kern, the Plaintiff reported feeling stalked by her neighbors and feeling that they wanted to know what she was doing and mimic her.  Specifically, she recounted an incident when she said her neighbor put a ladder outside because the neighbor saw her do it.

On April 24, 2002, Johnson noted that the Plaintiff cited some examples that may have been evident of some delusional or paranoid thinking.

On May 20, 2002, the Plaintiff, during a psychotherapy session with Kruchowski and Dr. Kern in which the Plaintiff displayed a disheveled appearance, stated that she had not been getting adequate sleep and that she had had difficulty concentrating.  At this time, she made several statements regarding her family and how they attempted to put her in "bad light" and how her neighbors wanted to befriend her only so that they could know what she was thinking.  (R. at 274.) Dr. Kern initiated 5 milligrams of Zyprexa in order to target symptoms of paranoia.

On June 6, 2002, during a follow-up visit, the Plaintiff reported that she felt that her son was moving things in the house just to "make [her] think [she was] crazy."  (R. at 272.)

On August 8, 2002, the Plaintiff met with Dr. Helen Lin, M.D., a staff psychiatrist at Southlake.  The Plaintiff appeared disheveled and tearful during the meeting, and she reported feeling quite tired and fatigued.  In order to lessen the fatigue, Dr. Lin discontinued the Klonopin.

On November 6, 2002, during another psychiatric appointment, Dr. Lin noted that "[s]he is really trying her best it appears." (R. at 262.)  Noting her history of major depression and possible paranoid personality disorder, Dr. Lin prescribed 200 milligram samples of Wellbutrin SR in addition to her previous and continuing prescriptions of Zyprexa and Zoloft.

**II.  Physical Impairments**

The Plaintiff attended the Highland Foot Clinic from 1992 to 1999 at which she was treated for foot pain, including: metatarsalgia[4], capsulitis[5], and neuritis[6] in her right foot, for which she had a disability certificate for shoes.  For the pain, she was prescribed 800 milligrams of Motrin.  During the course of treatment, the Plaintiff complained that she had pain in the arch of her foot from standing at work all day and experiences pain when working full time.  The Plaintiff stated that in 1987, she had surgery on both feet.

On September 17, 2001, Dr. Suresh Mahawar, M.D., performed a consultative examination of the Plaintiff at which time her complaints of pain concentrated on her wrists and feet.  At that time, the Plaintiff reported that she had been diagnosed with carpal tunnel syndrome and that her pain was throbbing and burning in nature most of the time.  The Plaintiff also stated that she was unable to walk more than three (3) blocks and unable to climb more than three (3) flights of stairs.  She also reported ankle and sole pain for ten (10) years, and that she had been diagnosed with arthritis in her feet and hands.  Dr. Mahawar's diagnosis impression was wrist pain with a history of carpal tunnel; ankle pain that could have been due to arthritis; sole pain that could have been due to plantar fascitis[7]; depression and anxiety; and obesity.

On October 13, 2001, Dr. R. Fife, M.D., a state agency medical examiner, performed an examination of the Plaintiff.  He concluded the primary diagnosis to be wrist and ankle pain, with

---

[4] Metatarsalgia refers to pain in the forefoot in the region of the heads of the metatarsals.  (Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45 ).

[5] Capsulitis refers to inflammation of the capsule of an organ or part, as of the liver, the lens of the eye, or surrounding a joint.  (Stedman's Online Medical Dictionary,  http://www.stedmans.com/section.cfm/45).

[6] Neuritis refers to inflamation of a nerve.   (Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45 ).

[7] Plantar fascitis refers to inflamation pertaining to the area surrounding and including the sole of the foot.  (Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45).

a secondary diagnosis of plantar fascitis.  He found no postural, manipulative, visual, communicative, or environmental limitations.

On an undisclosed date, the Plaintiff alleges that she was previously diagnosed with Type II diabetes.  On February 14, 2003, she had a diabetic checkup.  The Plaintiff also reported excessive uterine bleeding.  Over the following two months, the Plaintiff received treatment for uterine bleeding and physicians prescribed diabetic medication.

On August 8, 2003, the Plaintiff visited the St. Claire Health Clinic for a follow-up of her undometrial biopsy.  She stated that she felt extreme fatigue.

On October 17, 2003, the Plaintiff checked into the emergency room at St. Anthony Medical Center complaining of chest pain.  Dr. George Librandi, D.O., diagnosed her with "chest pain, resolved."  (R. at 295.)

On January 23, 2004, during a visit to the St. Claire Health Clinic, the Plaintiff complained of fatigue and shoulder pain.

### C. Hearings and the Plaintiff's testimony

### I.  June 4, 2003 hearing

At the June 4, 2003 hearing, the Plaintiff appeared without counsel.  ALJ Bernstein asked the Plaintiff if she was considering retaining counsel and she told him that she attempted to call attorneys listed on an SSA prehearing conference letter, but was unsuccessful.  She also told ALJ Bearnstein that she had called his office and left a message, but did not receive a return call.  In light of the Plaintiff's attempts to obtain counsel, ALJ Bernstein postponed her hearing and advised her to either call his office again, call an attorney listed on the SSA's instruction sheet, or call a private attorney if she wanted someone to represent her at the hearing.  ALJ Bernstein also indicated that he would assist her in obtaining an attorney if she needed help.

**II.  January 7, 2004 hearing**

At the January 7, 2004 hearing, the ALJ informed the Plaintiff that she had a right to be represented or to have counsel.  However, the Plaintiff stated that she wanted to proceed without counsel.  The Plaintiff testified that she was divorced and lived alone.  She further testified that her last full-time job was in 2000 when she worked as a pharmacy technician.  Prior to the technician job, she worked as a telemarketer, and, prior to that, she worked in a factory as a baby wipe inspector.  She testified that she could not work at any of those jobs now because of the pain in her feet.  The Plaintiff testified that she currently works three part-time jobs:  Aero Promotions, Portage Township School, and Catering With Care.  She works three (3) to four (4) days a week at these jobs, which provide her with about $500 per month.  The Plaintiff testified that the maximum number of hours she works on any given day is seven (7), when she works from 9:00 a.m. to 1:00 p.m. and again from 6:00 p.m. to 9:00 p.m.

The Plaintiff testified that when she gets home in the evening, she is "hardly able to walk", and that when she sits down, she is "hardly able to get back up."  (R. at 34.)  She explained that this is because of the neuropathy from diabetes, which also causes sharp pains in her feet and hands.  She further testified that she has problems using both of her hands because of carpal tunnel and arthritis.  She also testified that while her back causes her problems, most of the pain stems from heavy lifting and the repetitive use of her hands.  In addition, she noted that she felt nauseated as a side effect of one of her medications, and that she thought it was probably Zoloft.

With regard to her current job at Aero Promotion, the only job that requires her to be on her feet, the Plaintiff testified that she makes it through her six (6) hour shift by trying to walk around so that her feet will not become fatigued as a result of standing in one spot.  She also testified that, because of the problems using her hands, she had to cut back her hours during Christmas time at

Aero Promotions. She stated that these impairments also affected her ability to lift more than fifteen (15) to twenty (20) pounds without hurting herself.

When asked how she spent the day when she was not working, she testified that she was able to dress and bathe herself, clean, cook, shop, drive, run errands, mow the lawn, shovel snow, perform other normal house chores, go places with her friends, go out to dinner, and make crafts. After the ALJ acknowledged that there were some medical records that the Plaintiff would have liked to have had for the hearing, the Plaintiff testified that she had not received records from Dr. Cradd[8] and Dr. Lin. The ALJ indicated that he would request records from South Lake Clinic, and Drs. Lynn, Cradd, and Dragsa. The ALJ issued letters requesting additional information and he proffered the post-hearing evidence to the Plaintiff.

### D. Vocational Expert's Testimony

Dr. Leonard Fisher testified as the VE and was present during the Plaintiff's testimony. The ALJ posed a hypothetical to the VE asking if there would be any work available for an individual, forty-two (42) years of age with a high school education and the past work history that he summarized. The ALJ instructed the VE to assume that the individual is limited to work at the light exertional level or below[9], and is limited to occupations that require occasional postural movements such as twisting, crouching, crawling, and kneeling. The VE was also to assume that the individual could not work at occupations that would require repetitive use of the hands, and those that would

---

[8] While the Plaintiff refers to "Dr. Krad", the Commissioner and the Record refer to Dr. Cradd. *See* R. at 38.

[9] The Regulations define "light work" in the following manner:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

require working in the public or in close proximity or cooperation with others.  The VE testified that, given the Plaintiff's social limitations, she was not capable of performing any of her past employment, but that light jobs such as a courier or messenger would accommodate those limitations.

The VE further testified that there were approximately 2,500 jobs in Cook County and Lake County as a parking lot cashier, and 750 jobs as a locker room attendant, both of which had minimal contact with the public.  The Plaintiff did not pose any questions to the VE.

### E. ALJ's Opinion

On July 28, 2004, the ALJ issued a decision denying benefits to the Plaintiff.  The ALJ determined that the Plaintiff suffered from plantar fascitis, depression, and anxiety, which qualified as severe impairments.  However, the ALJ found that the Plaintiff's allegations regarding her limitations were "not fully credible."  (R. at 18.)  The ALJ ultimately found the Plaintiff to have an RFC to "perform light work, performing postural activities only on an occasional basis, but no work involving repeated hand use, public contact, or close proximity to co-workers."  (R. at 18.)  Further, the ALJ found that the Plaintiff had the residual capacity to perform a "significant range of light work," and, based on VE testimony, that the Plaintiff could make a "vocational adjustment" and perform a significant number of jobs in the national economy.  (R. at 17.)  Using Medical-Vocational Rule 202.21 as a framework, the ALJ concluded that the Plaintiff was not disabled and not entitled to benefits at Step Five because she could perform work as a messenger, parking attendant, locker attendant, and inspector.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

14

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he or she suffers from a "disability" as defined by the Social Security Act and Regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  To be found disabled, the claimant's impairment must not only prevent him or her from doing previous work, but considering age, education, and work experience, it must also prevent him or her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security Regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. § 404.1520(a)(4).  The Seventh Circuit has summarized the sequence as follows:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [his] past relevant work; and (5) whether the claimant is capable of performing work in the national economy.  Under the five-part sequential evaluation process, [a]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled.  If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations and internal quotations omitted) (alterations in original); *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).  At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.  "The RFC is an assessment of what work-related activities the claimant can

perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits."  *Zurawski*, 245 F.3d at 888.  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Young*, 362 F.3d at 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

In her opening brief, the Plaintiff argues that: (1) the ALJ did not obtain a valid waiver of counsel; (2) as a result of the invalid waiver of counsel, the ALJ failed to meet his heightened duty for a *pro se* claimant by not fully and fairly developing the record, which resulted in an erroneous RFC determination; (3) the ALJ failed to meet his burden at Step Five because he gave an incomplete and flawed hypothetical to the VE; and (4) the ALJ failed to make a proper credibility finding.  The Commissioner responds that (1) the Plaintiff was fully advised of her right to obtain

representation by ALJ Berstein at a pre-hearing conference statement; (2) the hearing record was complete and substantial evidence supported the ALJ's step five determination; (3) the ALJ provided the VE with a reasonable hypothetical question containing only those restrictions supported by the record as a whole; and (4) substantial evidence supported the ALJ's finding that the Plaintiff's subjective complaints were not fully credible.   The Court will address each of the Plaintiff's arguments in turn.

### A.  Waiver of Right To Counsel

The Plaintiff contends that the ALJ did not provide her with sufficient information to constitute a valid waiver of counsel.  More specifically, Gardenhire argues that, because she testified at the June 4, 2003 hearing that she desired attorney representation and then appeared at the January 7, 2004 hearing without representation, the ALJ had a duty to ask the Plaintiff why she decided to continue as a *pro se* claimant.  The Commissioner responds that ALJ Bernstein's statements at the June 4, 2003 hearing and the pre-hearing conference statement demonstrates that the Plaintiff was fully advised of her right to obtain representation, which she subsequently waived at the January 7, 2004 hearing.

A disability claimant has a statutory right to counsel at a disability hearing.  *See* 42 U.S.C. § 406, 20 § C.F.R. 404.1700.  If properly informed of the right, the claimant may waive it. *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir.1991).  To ensure a valid waiver of counsel, the ALJ must explain to the pro se claimant (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to twenty-five (25) percent of past due benefits and required court approval of the fees.  *Id.*; *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994).

At the June 4, 2003 hearing, ALJ Bernstein advised the Plaintiff of her right to representation.[10]  The Plaintiff responded that she attempted to retain representation but was unsuccessful.  The Plaintiff further stated that she wanted to obtain an attorney.  Accordingly, ALJ Bernstein, noting the Plaintiff's unsuccessful attempts to locate an attorney and her desire for representation, continued the hearing and even offered to help her call an attorney if she requested his assistance.  ALJ Bernstein postponed the Plaintiff's hearing for six (6) months.  At the January 7, 2004 hearing, the ALJ once again advised the Plaintiff of her right to be represented by counsel.  The ALJ then asked the Plaintiff if she "want[ed] to proceed without [c]ounsel", to which the Plaintiff responded "[y]es."  (R. at 32.)

While it is clear that both ALJ Bernstein and ALJ Neary advised the Plaintiff of her right to counsel, the Court notes that merely advising a claimant of her right to counsel, as the Government suggests, is not the applicable test for waiver of counsel.  On the contrary, as noted above, to ensure a valid waiver of counsel, the ALJ must explain to the pro se claimant (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to twenty-five (25) percent of past due benefits and required court approval of the fees.  *Thompson*, 933 F.2d at 584; *Binion,* 13 F.3d at 245.  After careful review of the record, while there is some evidence that ALJ Bernstein complied with the first two requirements, neither ALJ Bernstein nor ALJ Neary made any effort to inform the Plaintiff that attorney fees would be subject to a twenty-five (25) percent cap of past due benefits and that attorney fees required court approval.  Therefore, ALJ Bernstein and ALJ Neary ignored one of the express requirements under *Binion*.  Accordingly, the Court finds that the Plaintiff's waiver of

---

[10] The Plaintiff was also advised of her right prior to the hearing through a prehearing conference statement, which advised the Plaintiff of her right to representation and a list of phone numbers for attorneys she could contact.

18

counsel at the January 4, 2004 hearing was not valid.  *See Binion*, 13 F.3d at 245 (holding waiver of counsel as invalid because the ALJ failed to explain the twenty-five (25) percent cap on fees).

However, an inadequate notice of the right to counsel does not automatically entitle a plaintiff to remand unless the ALJ also fails to develop a full and fair record.  *See Binion*, 13 F.3d at 245 (citing *Smith v. Sec'y of Health, Education, & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978).

The Court next addresses whether the ALJ fully and fairly developed the record.

## B.  Fully and Fairly Develop the Record

In conjunction with her invalid waiver of counsel argument, the Plaintiff contends that the ALJ failed to meet his heightened duty to fully and fairly develop the record.  As a result, the Plaintiff alleges she suffered prejudice.  In particular, the Plaintiff argues that the ALJ erroneously determined that she was capable of performing light work, noting in support that the ALJ failed to fully and fairly develop the record by: (1) failing to obtain all relevant medical evidence; (2) failing to accord due weight to the state agency reviewing physicians; (3) failing to consider Gardenhire's mental impairments; and (4) failing to consider Gardenhire's diabetes and obesity, all of which resulted in an erroneous RFC.  The Court will consider each of these arguments in turn.

The burden of fully and fairly developing the hearing record is met "if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence."  *Binion*, 13 F.3d at 245.  The ALJ must undertake this task whenever a claimant is unrepresented by counsel, regardless of whether the waiver of counsel was valid.  *Id.*  Where the ALJ fails to meet this heightened duty, there is good cause to remand the case to gather additional evidence.  *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981).  In addition, even if a court finds that the ALJ did fully and fairly develop the record, plaintiffs can rebut this finding by demonstrating prejudice.  *Nelson v. Apfel*, 131 F.3d at 1228, 1235 n.3 (7th Cir. 1997).  Such prejudice may be demonstrated by showing that the ALJ

"failed to elicit all of the relevant information from the claimant." *Id*. In order to determine whether

an ALJ's development of the record qualifies as "full and fair," the Court considers a number of

factors, including: (1) whether the ALJ obtained all of the claimant's medical and treatment records;

(2) whether the ALJ elicited detailed testimony from the claimant at the hearing (probing into

relevant areas, including medical evidence on the record, medications, pain, daily activities, the

nature of all physical and mental limitations, etc.), and (3) whether the ALJ heard testimony from

examining or treating physicians. *See Binion*, 13 F.3d at 245.

       1.    *Relevant medical evidence*

      The Plaintiff contends that the ALJ failed to fully and fairly develop the record by failing to

obtain medical records or a consultative examination from treating or consulting physicians.

Specifically, the Plaintiff argues that the ALJ never attempted to obtain medical records, any

Medical Source Statements ("MSS"), or a consultative examination from Dr. Cradd, the physician

who reportedly diagnosed her with diabetes, Dr. Lin, and/or Dr. Dragsa. The Commissioner

responds that (1) the record reflects that the Plaintiff underwent at least two (2) state-ordered

consultative examinations that were reviewed by at least four (4) state agency

physicians/psychologists, and (2) the SSA attempted to obtain the disputed medical records to no

avail.

      When determining a disability, "although the [Social Security Administration] will request

a medical source statement about what [a claimant] can still do despite [her] impairment(s), the lack

of the medical source statement will not make the record incomplete." 20 C.F.R. § 404.1513(b)(6).

The record illustrates that the ALJ requested MSS reports from the Southlake clinic, Dr. Cradd, and

Dr. Dragsa. The ALJ informed the Plaintiff that he could not obtain the records from Dr. Cradd and

that the Plaintiff needed to obtain a lawyer to procure the records. The ALJ then asked the Plaintiff

if there were any other records he needed in order to review the claim, to which she responded no. The fact that the ALJ was unable to obtain a MSS report from various physicians, as requested, does not render the record incomplete. *See* 20 C.F.R. § 404.1513(b)(6). Moreover, the Court finds that the ALJ went beyond the call of the Social Security Regulations by: (1) providing the Plaintiff with information on how to obtain the records; (2) writing to inform her that he had received the additional records that she asked him to obtain; and (3) stating that he was adding them into his consideration of her case.

Furthermore, as the Government points out, the record reflects that the Plaintiff underwent two (2) state-ordered consultative examinations (one mental and one physical) conducted by Dr. Patrick J. McKian, Ph.D on September 26, 2001 and by Dr. Suresh Mahawar, M.D. on September 17, 2001. The record further demonstrates that at least four (4) State Agency reviewing physicians and psychologists reviewed the record before the January 7, 2004 hearing.

Accordingly, the Court concludes that neither the fact that the ALJ was unable to obtain all medical records nor the fact that no document designated as a MSS report was included in the record renders the record incomplete, especially considering the wealth of other relevant medical evidence in the record.

2.    *State agency reviewing physicians*

The Plaintiff contends that the ALJ failed to fully and fairly develop the record by failing to afford full weight to the state agency reviewing physicians who examined her. The Plaintiff argues that while the ALJ correctly rejected Dr. Fife's determination that the Plaintiff was capable of medium work, the ALJ failed to "dictate what information he relies on in place of Dr. Fife's testimony." The Plaintiff argues that the ALJ played "amateur doctor" and substituted his opinion for Dr. Fife's without building an "accurate and logical bridge" from the evidence to the conclusion.

The Commissioner responds that the Plaintiff's argument lacks merit because by affording less weight to the state agency reviewing physicians who determined that she retained the ability to perform medium work, the ALJ actually credited the Plaintiff's subjective complaints.

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

In the instant case, substantial evidence supports the ALJ's decision to credit the testimony of the Plaintiff and the opinions of two state physicians over the opinions of two others. Specifically, the Plaintiff admitted to the ALJ that she had little to no trouble performing daily activities, maintaining social functioning, or maintaining concentration, the very activities Dr. Shipley deemed impaired. In addition, the Court finds that, by affording little credit to Dr. Fife, the ALJ actually afforded credibility to the Plaintiff's subjective complaints and further restricted her by limiting her to light work. Also, the ALJ did not mention the opinion of Dr. Shipley, a State Agency psychologist who found at least mild impairments in the Plaintiff's ability to perform daily activities, maintain social functioning, and maintain concentration, choosing instead to credit Drs. Mahawar and McKian. Therefore, the Court finds that the ALJ did not fail to fully and fairly develop the record by affording different levels of credit to different state examiners.

3.    *Mental impairments*

The Plaintiff contends that the ALJ failed to fully develop the record regarding the Plaintiff's mental impairments. Specifically, the Plaintiff claims that, although the ALJ found her depression and anxiety to be "severe" pursuant to 20 C.F.R. § 404.1520(c), the ALJ failed to apply the "special technique" at Step Three regarding rating the Plaintiff's degree of mental functioning. The Commissioner responds, citing evidence in support, that the ALJ considered the Plaintiff's alleged mental impairments.

Pursuant to Federal Regulations, the "special technique" to rating the degree of mental functioning is only intended to aid an adjudicator in assessing the level of severity of a claimant's mental impairment at Steps Two and Three of the Five-Step sequential evaluation. 20 C.F.R. § 404.1520a(c)(3) (citing 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)).

In the instant case, the ALJ conducted a proper Step Three analysis when he explicitly determined that the Plaintiff's mental impairments were not of listing level severity. Specifically, the ALJ found that the Plaintiff suffered from "depression, characterized by sleep disturbances, lack of interest, appetite fluctuations, and lack of energy, as well as anxiety, characterized by paranoia." (R. at 14). These impairments do not equate with listing level severity because they do not meet both the A and B levels under the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.04, 12.06. Thus, because the Plaintiff's limitations were properly found to fall short of listing level, the special technique of rating a claimant's degree of mental functioning was not warranted and the failure to perform the technique did not result in an incomplete record.

### 4.    *Diabetes and obesity*

The Plaintiff contends that the ALJ failed to fully and fairly develop the record by disregarding her diabetes and obesity. With regard to diabetes, the Plaintiff argues that the ALJ failed to consider the extent of her diabetes and the related physical limitations stemming therefrom.

23

With regard to obesity, the Plaintiff argues that the ALJ failed to follow SSR 02-1p by not adequately considering the severity of the Plaintiff's obesity as well as the combined effects created with other impairments.  With regard to the diabetes, the Commissioner responds that the record shows that the Plaintiff's treatment for diabetes "appeared rather conservation [sic]", and to the extent diabetes caused any level of limitation on the Plaintiff, the ALJ considered her subjective statements.  With regard to the obesity, the Commissioner responds that the ALJ considered the effect of obesity in combination with her other conditions and the record lacks medical evidence to substantiate any limiting effects otherwise not accommodated in the ALJ's RFC finding.

In formulating the RFC, "an ALJ may not ignore an entire line of evidence that is contrary to [his] findings." *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).  However, it is sufficient for the ALJ to "articulate, at some minimum level, her analysis of the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

In the instant case, the ALJ noted the Plaintiff's weight and her subjective statements regarding the restrictions her diabetes placed on her ability to work.  After considering this evidence, the ALJ concluded that the Plaintiff's statements lack credibility due to the Plaintiff's extensive social and daily activities:

> The claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the discrepancies between the claimant's assertions and information contained in the documentary reports, as well as her ability to perform daily activities.  The claimant alleges disability since May 2001, however, she currently works three part-time jobs and attends school.

(R. at 15).  Further, the ALJ noted that, "when [the Plaintiff is] not working or in school, she testified she performs the usual activities, such as running errands, cleaning, washing clothes, and cooking." (R. at 15).  The ALJ also considered Dr. Mahawar's consultation examination and the

state agency physician opinions, neither of which indicate that the Plaintiff's obesity contributed to her functional limitations or rendered her incapable of performing light work.

In conclusion, the ALJ restricted the Plaintiff to light work with occasional postural limitations, notwithstanding his determination that her subjective statements were not credible. An ALJ has no duty to describe in detail each factor that enters into an RFC determination, and, taking into account the minimal effect the Plaintiff's obesity and diabetes had on her ability to carry out work, school, and daily activities, substantial evidence supports the ALJ's RFC determination. Thus, because the Plaintiff can point to no relevant information that the ALJ failed to include in the record, the Court finds that there was no showing of prejudice and that the record was fully and fairly developed.

### 5. *RFC Determination*

The Plaintiff contends that the ALJ's RFC finding was erroneous because it failed to follow SSR 96-8P, which requires a function-by-function RFC assessment. More specifically, the Plaintiff argues that the ALJ failed to adequately consider the Plaintiff's mental and physical limitations. The Commissioner responds that substantial evidence supports the ALJ's RFC finding, noting objective medical evidence, physician opinions of record, the Plaintiff's daily activities, and other evidence of record.

"Residual functional capacity", or RFC, is a measure of what an individual can do despite the limitations imposed by his or her impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The RFC is an issue at steps 4 and 5 of the sequential evaluation process. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8P

at *3.  To ensure a valid RFC determination, the ALJ must follow SSR 96-8P, which provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work related abilities on a function-by-function basis."  *Id* at *1.  This assessment further "include[s] a narrative discussion describing how the evidence supports each conclusion ...." *Id* at *7.

In this case, the ALJ found that the Plaintiff was capable of performing a limited range of light work[11], limited to occupations that require occasional postural movements such as twisting, crouching, crawling, and kneeling.  The ALJ further found that the Plaintiff could not perform jobs with repetitive use of the hands, or which required working in public or in close proximity or cooperation with others. Once the ALJ had laid out the Plaintiff's limitations as required by SSR 96-8P, the ALJ then supplied the relevant and required "narrative discussion" in which the ALJ relied on the Plaintiff's subjective complaints,  the report of Dr. Mahawar, the report of Dr. McKian, the Plaintiff's daily activities, the report of state medical consultant Dr. Fife, the testimony of the VE, and the Plaintiff's social functioning ability.

Accordingly, the Court finds that the ALJ complied with SSR 96-8P in formulating his RFC determination.

### D.  ALJ's Hypothetical to the VE

The Plaintiff argues that because the ALJ made errors in evaluation and flaws in reasoning as to the credibility and RFC determinations, the ALJ failed to include questions in the hypothetical presented to the VE that accurately reflect all of the limitations faced by the Plaintiff.  The

---

[11] *See supra* note 9.

Commissioner responds by stating that the RFC and credibility determinations were sound, and accordingly the hypothetical was also sound.

A hypothetical question presented to a VE "must fully set forth the claimant's impairments to the extent they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *see also Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). In the instant case, the ALJ posed the following hypothetical to the VE:

> "...assume that individual is limited to work at the light exertional level or below, is limited to occupations which require occasional postural movements such as twisting, crouching, crawling, and kneeling. Assume the individual could not work at occupations which require repetitive use of the hands, could not work in occupations which require working in the public or in close proximity or cooperation with others."

(R. at 42.) In response, the VE identified more than 4,000 regional jobs that the Plaintiff could perform. The Court finds that because the ALJ's RFC and credibility determinations were sound, based on substantial evidence, and appropriately articulated, the hypothetical question based on these findings accurately reflected the Plaintiff's limitations and was therefore proper.

### E. Credibility Determination

The Plaintiff contends that the ALJ failed to follow SSR 96-7p and make a proper credibility finding. More specifically, citing SSR 96-7p, the Plaintiff argues that the ALJ ignored the fact that her allegations need only be reasonably related to medical diagnoses in order to be credible. Further, the Plaintiff argues that certain activities that she performs, such as attending school, driving, doing crafts, living alone, and going out with friends, are so minimal that they cannot support a conclusion that she is capable of light work. The Commissioner responds that, given the record as a whole, the ALJ reasonably concluded that the Plaintiff was not limited to the extent she alleged and that ample, independent evidence exists to support the ALJ's credibility determination.

27

The Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work.  *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*.  The Regulations establish a two-part test for determining whether subjective complaints of pain contribute to a finding of disability:  (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.  *See* 20 C.F.R. § 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

In applying this two-part test, an ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence as well as any other evidence.  In addition, the ALJ may consider the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In making a credibility determination, Social Security Ruling 96-7p provides that an ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the

28

symptoms and how they affect the individual, and any other relevant evidence in the case record."
SSR 96-7P at *1.  The Ruling further provides that the "determination or decision must contain
specific reasons for the finding on credibility, supported by the evidence in the case record, and must
be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight
the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7P; *see*
*Steele v. Barnhart*, 290 F.3d 396, 942 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887.

      Moreover, an ALJ is not required to give full credit to every statement of pain or to find a
disability every time a claimant states that he or she is unable to work.  *Rucker v. Chater*, 92 F.3d
492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding
symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because
they are not substantiated by objective evidence.'"  SSR 96-7P at *6.

      Moreover, the Regulations provide that "the adjudicator may also consider his or her own
recorded observations of the individual as part of the overall evaluation of the credibility of the
individual's statements."  SSR 96-7P.  As the Seventh Circuit has stated, "because hearing officers
are in the best position to see and hear the witnesses and assess their forthrightness, we afford their
credibility determinations special deference."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)
(internal quotations and citations omitted).  Generally, an ALJ's credibility determination will not
be overturned unless it was "patently wrong."  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003);
*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (providing that "[s]ince the ALJ is in the best
position to observe witnesses, we usually do not upset credibility determinations on appeal so long
as they find some support in the record and are not patently wrong").

      In the instant case, at the January 4, 2004 hearing, the Plaintiff testified that she weighed 257
pounds and that she was unable to work full time due to sharp pain in her feet and pain in her hands,

resulting in finger numbness and stiffness. She testified that she had occasional back trouble and that her pain prevented her from standing more than six (6) hours or lifting more than twenty (20) pounds. She testified that she worked three part-time jobs and performed activities such as running errands, cleaning, washing clothes, and cooking. The Plaintiff testified that she lived alone and did not report needing any help maintaining her residence. Finally, she testified that she drove, did crafts, went out to dinner with friends, and attended school on Mondays and Wednesdays.

In his decision, the ALJ identified medical impairments of plantar fasciitis, depression, and anxiety. In making an RFC assessment, the ALJ determined that:

> The claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the discrepancies between the claimant's assertions and information contained in the documentary reports, as well as her ability to perform daily activities. The claimant alleges disability since May 2001, however, she currently works three part-time jobs and attends school. Although the claimant testified she earns no more than $500.00 per month, indicating her work activity does not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater that the claimant generally reported.

(R. at 15.) The ALJ then summarized the medical evidence from the relevant period of time, noting that (1) the Plaintiff's allegation of hand pain due to carpel tunnel and arthritis was not supported by current treatment; (2) the Plaintiff's allegation of back pain was not supported by any symptomatology to support a lumbar impairment, and the Plaintiff was never referred to a back specialist or clinic, did not use assistive devices, did not require surgery or inpatient care, and only took over the counter medication for pain. The ALJ also discussed the effectiveness of Gardenhire's medications, noting that she had shown continued improvement since 2001 due to Klonopin, Zyprexia, Zoloft, and Wellbutrin, with little to no side effects and a decrease in fatigue. Concluding his credibility discussion, the ALJ reasoned that:

> In spite of the claimant's physical and mental allegations, she lives alone and has not reported any particular help in maintaining the residence. The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. Moreover, the claimant has described daily activities which are consistent with the residual functional capacity determined in the body of this decision. The claimant testified she experiences hand numbness and pain, yet she continues to drive and does crafts. In spite of her paranoia, she testified she goes out to dinner with her friends and attends school on Mondays and Wednesdays.

(R. at 16.)

Furthermore, at the January 4, 2004 hearing, the Plaintiff's own testimony contradicted her complaints. She complained of hand and back pain, yet testified that she had no trouble performing everyday activities including driving, cooking, cleaning, shoveling snow, running errands, mowing the lawn, working three part-time jobs, attending class, dining with friends, and building crafts. She further complained of psychosis and paranoia, yet testified that she had no problems living alone and enjoyed dining in public with friends. Because the ALJ is in the best position to determine the credibility of a witness, a Court will not overturn his determination unless it was "patently wrong." In this case, the Plaintiff failed to demonstrate that the ALJ was "patently wrong" in determining that the Plaintiff's subjective statements concerning her impairments and their impact on her ability to work were not entirely credible.

Accordingly, the Court finds that there is no indication from the record as a whole that the ALJ's credibility determination was "patently wrong." On the contrary, based on the foregoing evidence, the Court finds that the ALJ acted reasonably in weighing the Plaintiff's subjective complaints with the objective medical evidence.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** the Plaintiff's Memorandum in Support of Summary Judgment or Remand [DE 20].   The court **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 12th day of September, 2006.

s/ Paul R. Cherry
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record

32