**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| PEGGY A. GARDENHIRE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:05-CV-88-PRC |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration,[1] | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion to Alter or Amend Judgment Pursuant

to Fed.R.Civ.P. 59(e) [DE 31], filed by Plaintiff Peggy Gardenhire on September 27, 2006.  On

October 11, 2006, Defendant Michael J. Astrue, the Commissioner of the Social Security

Administration (hereinafter, "Commissioner"), filed Defendant's Response to Plaintiff's Motion to

Alter or Amend Judgment to Fed.R.Civ.P. 59(e).  On October 19, 2006, the Plaintiff filed Plaintiff's

Reply in Support of her Motion to Alter or Amend Judgment Pursuant to Fed.R.Civ.P. 59(e).  For

the following reasons, the Court grants Plaintiff's Motion.

**PROCEDURAL BACKGROUND**

The Plaintiff filed an application for DIB and Supplemental Security Income ("SSI") on June

26, 2001, alleging disability since May 16, 2001.  Her application was denied initially on October

18, 2001, and again upon reconsideration on March 12, 2002.  On April 11, 2002,  the Plaintiff filed

a request for a hearing, which was first held on June 4, 2003, before Administrative Law Judge

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of the Social Security Administration.
Pursuant to Federal Rule of Civil Procedure 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is
automatically substituted as the Defendant in this civil action.

("ALJ") Bryan Bernstein.[2]  Because the Plaintiff was without counsel, ALJ Berstein continued the case to afford Gardenhire time to obtain counsel.  On January 7, 2004, the Plaintiff appeared, *pro se*, before ALJ Steven Neary.[3]  At the January 7, 2004 hearing, the Vocational Expert ("VE") Leonard Fischer testified.  On July 28, 2004, the ALJ issued a decision finding that, although the Plaintiff had severe impairments[4], she nevertheless was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity ("RFC") to do a moderate range of jobs in the economy.  In the decision, the ALJ made the following findings relevant to the DIB determination:

> (1)     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

> (2)     The claimant has not engaged in any substantial gainful activity since the alleged onset of disability.

> (3)     The claimant's plantar fascitis, depression, and anxiety are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

> (4)     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

> (5)     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for

---

[2] Although the Plaintiff's opening brief repeatedly refers to this hearing as being held on January 4, 2004, the record reflects that the date of the hearing with ALJ Bernstein was June 4, 2003.  R. at 22.

[3] Hereinafter, unless otherwise specified, "ALJ" refers to ALJ Neary with regard to the January 7, 2004 hearing.

[4] Pursuant to 20 C.F.R. § 404.1520(c), a "severe impairment" is an impairment that significantly limits a claimant's ability to perform basic work activities.

the reasons set forth in the body of the decision.

(6)     The claimant has the following residual functioning capacity to perform light work, performing postural activities only on an occasional basis, but no work involving repeated hand use, public contact, or close proximity to co-workers.

(7)     The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(8)     The claimant is 42 years old, considered a "younger individual" (20 C.F.R. §§ 404.1563 and 416.964).

(9)     The claimant has a "high school (or high school equivalent) education" (20 C.F.R. §§ 404.1564 and 416.964).

(10)    The claimant has no transferrable skills from semi-skilled work previously performed as described in the body of the decision (20 C.F.R. §§ 404.1568 and 416.968).

(11)    The claimant has the residual functioning capacity to perform a significant range of light work (20 C.F.R. §§ 404.1567 and 416.967).

(12)    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

R. at 18-19.  On January 7, 2005, the Appeals Council denied the Plaintiff's request for review.

On March 7, 2005, the Plaintiff filed a *pro se* Complaint in this Court.

## FACTS[5]

### A.      Background

At the time of the January 7, 2004 hearing, the Plaintiff was 43 years old.  She was 5'6" tall and weighed 244 pounds.  She received her high school diploma in 1979.  Although the Plaintiff was attending Illinois University to be a radiology technician at the time of the hearing, she has since dropped out of school.  Her past relevant work consists of work as a telemarketer, cashier, inspector, pharmacy technician, and assembler.  The Plaintiff alleges that she became disabled on May 16, 2001, as a result of depression, anxiety, diabetes, arthritis, and carpal tunnel syndrome.

### B.      Medical Evidence

#### 1.      *Mental Impairments*

The earliest mental health records from the administrative record are from Dr. Gracilea Hernandez, M.D., a physician at Saint Margaret Mercy Healthcare Center.  On April 24, 1993, the Plaintiff was admitted for seventy-two (72) hour emergency detention because her family said that she was "depressed and paranoid."  R. at 140.  On the day of her admission, she told a counselor that she had been having suicidal thoughts.  Upon being evaluated in the emergency room and after signing herself as a voluntary admission, the Plaintiff ran out of the hospital and had to be restrained by security personnel, whom she scratched and bit.  Her family then petitioned for involuntary commitment.  After a nine-day stay, the Plaintiff was discharged with a diagnosis of a major depressive disorder, unspecified with psychosis; overweight; left conjunctivitis secondary to trauma; and nonspecific lower back pain.  At this time, her doctor placed her on Zoloft, of which she currently takes two hundred (200) milligrams per day.

---

[5]The facts below are the same as they appear in the Court's September 12, 2006 Opinion and Order.

Since the 1993 episode and subsequent commitment, the Plaintiff has had repeated bouts of depression and paranoia, for which she has sought treatment from Dr. Sudhir Gakhale, M.D., a psychiatrist in Oaklawn, Illinois. From approximately 1993 through July 1998, Dr. Gakhale provided medication and individual psychotherapy. There are no medical records from Dr. Gakhale in the administrative record. In approximately the summer of 1998, the Plaintiff ceased treatment from him due to a lack of insurance coverage.

On March 2, 2000, the Plaintiff began a course of treatment at Southlake Center for Mental Health ("Southlake"). According to the "intake narrative", she reported that she was very overwhelmed with her thoughts, and that her mind felt like it was in a "chronic brain cramp." R. at 178. She reported that, in February 2000, she was fired from her job as a telemarketer, which has caused her to feel intense nervousness. She alleged that her superior, when she worked as a telemarketer, was "watching me, listening to me" and her company "didn't want me to use their dental insurance." R. at 178. She also admitted to throwing papers at her boss and cursing at him when she was fired. The Plaintiff's Global Assessment of Mental Functioning ("GAF") at the time of this appointment was 60.

On March 27, 2000, the Plaintiff underwent a psychiatric evaluation by Dr. Natalia Fudim, M.D., a staff psychiatrist at Southlake. She complained that she felt tired all of the time and that she "d[idn't] have a grip on life." R. at 196. Dr. Fudim noted that the Plaintiff was "quite tearful throughout the session" and that she appeared depressed. R. at 197. Dr. Fudim also noted that there was a paranoid theme present in the Plaintiff's feeling that people were jealous of her and that these people were perhaps responsible for her losing jobs in the past. The Plaintiff's GAF at the time of the evaluation was 45.

5

On April 12, 2000, during a one-hour therapy session with Dr. Ginger Wegner at Southlake, the Plaintiff complained that she could not recall details of the day and that she felt criticized and left out by family members.

On April 13, 2000, Dr. Fudim reported that the Plaintiff's crying spells had decreased and that she reported feeling better.  She informed Dr. Fudim that, since her last visit, she obtained employment as a pharmacy technician and was inquiring into obtaining another position as a pharmacy technician at the Hammond Clinic.

On July 25, 2000, during another one-hour therapy session with Dr. Wegner, the Plaintiff stated that although she received a favorable review on her job performance, she still felt that co-workers were trying to hold her back and keep her from being more successful.  The Plaintiff also reported that she was diagnosed with diabetes and that she felt better with an increase in Zoloft.  Her GAF at this appointment was 60.

On April 6, 2001, the Plaintiff returned to Southlake for a psychotherapy session for her Major Depressive Disorder.  Dr. Fudim noted that she was quite overwhelmed and tearful at the visit.  He increased her Zoloft prescription to 100 milligrams per day.

On June 8, 2001, during another psychotherapy session at Southlake with Dr. Fudim, the Plaintiff reported that she had been fired and that she was depressed due to the firing and problems with her son.  Dr. Fudim increased her Zoloft from 100 milligrams to 150 milligrams per day and ordered her to return in one month.

On July 6, 2001, the Plaintiff returned to Southlake for another psychotherapy session and Dr. Fudim increased her Zoloft to 200 milligrams per day.

On August 28, 2001, the Plaintiff underwent a psychiatric evaluation at Southlake with

Kristina Kruchowski, a clinical nurse specialist.  The Plaintiff stated that she felt stressed and overwhelmed because of her unemployment.  She also admitted to intermittent suicidal ideation within the last couple of months, and that she had thought about harming others, but no one in particular.  Kruchowski noted that she appeared unhappy and slightly anxious.  Kruchowski continued the 200 milligrams of Zoloft per day and initiated 0.5 milligrams of Klonopin, in order to target her residual symptoms of anxiety.  Kruchowski diagnosed the Plaintiff  with a GAF of 55.

On September 26, 2001, Dr. Patrick J. McKian, Ph.D., a clinical psychologist, performed a mental status examination on the Plaintiff.  Dr. McKian reported that the Plaintiff had a history of depression and that she had been fired from a number of jobs because of personal problems with coworkers.  The Plaintiff informed Dr. McKian that she had some memory problems, feelings of depression, and difficulty standing because of the pain in her feet.  Dr. McKian noted that while talking about losing employment, the Plaintiff exhibited some "paranoid traits as she always saw [losing her job] as being someone else's fault and that people were against her."  R. at 218.  Dr. McKian diagnosed the Plaintiff with recurring major depression and a panic disorder without agoraphobia.  He also determined that she had a GAF of 55.

On October 10, 2001, Dr. W. Shipley, Ph.D., a State Agency psychiatrist, performed an examination of the Plaintiff.  Dr. Shipley found the Plaintiff to have no severe impairments, but found that she suffered from affective and anxiety-related disorders.  Dr. Shipley diagnosed the Plaintiff with mild limitations on her daily activities and social functioning, and on maintaining concentration, persistence, or pace.

On October 30, 2001, in written documents accompanying her master treatment plan, the Plaintiff reported that she felt harassed by people using pink pens if they saw her using one.

On November 26, 2001, Kruchowski and Dr. John Kern, M.D., medical director at Southlake, observed that the Plaintiff appeared psychiatrically stable and in no acute distress. In her four subsequent visits, stemming from December 17, 2001 through March 25, 2002, Kruchowski and Dr. Kern reported similar positive findings regarding the Plaintiff appearing psychiatrically stable and in no acute distress.

On March 28, 2002, Kim Johnson, a staff social worker at Southlake, observed that Gardenhire appeared to be experiencing a complex grief reaction with her brother's suicide. The Plaintiff also reported that she found out that her ex-husband molested her son when he was five years-old on more than one occasion. When the Plaintiff indicated her desire to limit miscellaneous appointments, Johnson responded that if she did not see the Plaintiff in April, 2002, her case would be closed.

On April 22, 2002, during a psychotherapy session with Kruchowski and Dr. Kern, the Plaintiff reported feeling stalked by her neighbors and feeling that they wanted to know what she was doing and mimic her. Specifically, she recounted an incident when she said her neighbor put a ladder outside because the neighbor saw her do it.

On April 24, 2002, Johnson noted that the Plaintiff cited some examples that may have been evidence of some delusional or paranoid thinking.

On May 20, 2002, the Plaintiff, during a psychotherapy session with Kruchowski and Dr. Kern in which the Plaintiff displayed a disheveled appearance, stated that she had not been getting adequate sleep and that she had had difficulty concentrating. At this time, she made several statements regarding her family and how they attempted to put her in "bad light" and how her neighbors wanted to befriend her only so that they could know what she was thinking. R. at 274.

8

Dr. Kern initiated 5 milligrams of Zyprexa in order to target symptoms of paranoia.

On June 6, 2002, during a follow-up visit, the Plaintiff reported that she felt that her son was moving things in the house just to "make [her] think [she was] crazy."  R. at 272.

On August 8, 2002, the Plaintiff met with Dr. Helen Lin, M.D., a staff psychiatrist at Southlake.  The Plaintiff appeared disheveled and tearful during the meeting, and she reported feeling quite tired and fatigued.  In order to lessen the fatigue, Dr. Lin discontinued the Klonopin.

On November 6, 2002, during another psychiatric appointment, Dr. Lin noted that "[s]he is really trying her best it appears." R. at 262.  Noting her history of major depression and possible paranoid personality disorder, Dr. Lin prescribed 200 milligram samples of Wellbutrin SR in addition to her previous and continuing prescriptions of Zyprexa and Zoloft.

   *2.  Physical Impairments*

The Plaintiff attended the Highland Foot Clinic from 1992 to 1999 at which she was treated for foot pain, including: metatarsalgia[6], capsulitis[7], and neuritis[8] in her right foot, for which she had a disability certificate for shoes.  For the pain, she was prescribed 800 milligrams of Motrin.  During the course of treatment, the Plaintiff complained that she had pain in the arch of her foot from standing at work all day and experiences pain when working full time.  The Plaintiff stated that in 1987, she had surgery on both feet.

On September 17, 2001, Dr. Suresh Mahawar, M.D., performed a consultative examination

---

[6] Metatarsalgia refers to pain in the forefoot in the region of the heads of the metatarsals.  (Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45 ).

[7] Capsulitis refers to inflammation of the capsule of an organ or part, as of the liver, the lens of the eye, or surrounding a joint.  (Stedman's Online Medical Dictionary,  http://www.stedmans.com/section.cfm/45).

[8] Neuritis refers to inflamation of a nerve.   (Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45 ).

of the Plaintiff at which time her complaints of pain concentrated on her wrists and feet.  At that time, the Plaintiff reported that she had been diagnosed with carpal tunnel syndrome and that her pain was throbbing and burning in nature most of the time.  The Plaintiff also stated that she was unable to walk more than three (3) blocks and unable to climb more than three (3) flights of stairs. She also reported ankle and sole pain for ten (10) years, and that she had been diagnosed with arthritis in her feet and hands.  Dr. Mahawar's diagnosis impression was wrist pain with a history of carpal tunnel; ankle pain that could have been due to arthritis; sole pain that could have been due to plantar fascitis[9]; depression and anxiety; and obesity.

On October 13, 2001, Dr. R. Fife, M.D., a state agency medical examiner, performed an examination of the Plaintiff.  He concluded the primary diagnosis to be wrist and ankle pain, with a secondary diagnosis of plantar fascitis.  He found no postural, manipulative, visual, communicative, or environmental limitations.

On an undisclosed date, the Plaintiff alleges that she was previously diagnosed with Type II diabetes.  On February 14, 2003, she had a diabetic checkup.  The Plaintiff also reported excessive uterine bleeding.  Over the following two months, the Plaintiff received treatment for uterine bleeding and physicians prescribed diabetic medication.

On August 8, 2003, the Plaintiff visited the St. Claire Health Clinic for a follow-up of her undometrial biopsy.  She stated that she felt extreme fatigue.

On October 17, 2003, the Plaintiff checked into the emergency room at St. Anthony Medical Center complaining of chest pain.  Dr. George Librandi, D.O., diagnosed her with "chest pain, resolved."  R. at 295.

---

[9] Plantar fascitis refers to inflamation pertaining to the area surrounding and including the sole of the foot. (Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45).

On January 23, 2004, during a visit to the St. Claire Health Clinic, the Plaintiff complained of fatigue and shoulder pain.

**C.      Hearings and the Plaintiff's testimony**

*1. June 4, 2003 hearing*

At the June 4, 2003 hearing, the Plaintiff appeared without counsel.  ALJ Bernstein asked the Plaintiff if she was considering retaining counsel and she told him that she attempted to call attorneys listed on an SSA prehearing conference letter, but was unsuccessful.  She also told ALJ Bernstein that she had called his office and left a message, but did not receive a return call.  In light of the Plaintiff's attempts to obtain counsel, ALJ Bernstein postponed her hearing and advised her to either call his office again, call an attorney listed on the SSA's instruction sheet, or call a private attorney if she wanted someone to represent her at the hearing.  ALJ Bernstein also indicated that he would assist her in obtaining an attorney if she needed help.

*2. January 7, 2004 hearing*

At the January 7, 2004 hearing, the ALJ informed the Plaintiff that she had a right to be represented or to have counsel.  However, the Plaintiff stated that she wanted to proceed without counsel.  The Plaintiff testified that she was divorced and lived alone.  She further testified that her last full-time job was in 2000 when she worked as a pharmacy technician.  Prior to the technician job, she worked as a telemarketer, and, prior to that, she worked in a factory as a baby wipe inspector.  She testified that she could not work at any of those jobs now because of the pain in her feet.  The Plaintiff testified that she currently works three part-time jobs: Aero Promotions, Portage Township School, and Catering With Care.  She works three (3) to four (4) days a week at these jobs, which provide her with about $500 per month.  The Plaintiff testified that the maximum

11

number of hours she works on any given day is seven (7), when she works from 9:00 a.m. to 1:00 p.m. and again from 6:00 p.m. to 9:00 p.m.

The Plaintiff testified that when she gets home in the evening, she is "hardly able to walk", and that when she sits down, she is "hardly able to get back up."  R. at 34.  She explained that this is because of the neuropathy from diabetes, which also causes sharp pains in her feet and hands.  She further testified that she has problems using both of her hands because of carpal tunnel and arthritis.  She also testified that while her back causes her problems, most of the pain stems from heavy lifting and the repetitive use of her hands.  In addition, she noted that she felt nauseated as a side effect of one of her medications, and that she thought it was probably Zoloft.

With regard to her current job at Aero Promotion, the only job that requires her to be on her feet, the Plaintiff testified that she makes it through her six (6) hour shift by trying to walk around so that her feet will not become fatigued as a result of standing in one spot.  She also testified that, because of the problems using her hands, she had to cut back her hours during Christmas time at Aero Promotions.  She stated that these impairments also affected her ability to lift more than fifteen (15) to twenty (20) pounds without hurting herself.

When asked how she spent the day when she was not working, she testified that she was able to dress and bathe herself, clean, cook, shop, drive, run errands, mow the lawn, shovel snow, perform other normal house chores, go places with her friends, go out to dinner, and make crafts.  After the ALJ acknowledged that there were some medical records that the Plaintiff would have liked to have had for the hearing, the Plaintiff testified that she had not received records from Dr. Cradd[10] and Dr. Lin.  The ALJ indicated that he would request records from South Lake Clinic, and

---

[10] While the Plaintiff refers to "Dr. Krad", the Commissioner and the Record refer to Dr. Cradd.  *See* R. at 38.

Drs. Lynn, Cradd, and Dragsa.  The ALJ issued letters requesting additional information and he proffered the post-hearing evidence to the Plaintiff.

**D.      Vocational Expert's Testimony**

Dr. Leonard Fisher testified as the VE and was present during the Plaintiff's testimony.  The ALJ posed a hypothetical to the VE asking if there would be any work available for an individual, forty-two (42) years of age with a high school education and the past work history that he summarized.  The ALJ instructed the VE to assume that the individual is limited to work at the light exertional level or below[11], and is limited to occupations that require occasional postural movements such as twisting, crouching, crawling, and kneeling.  The VE was also to assume that the individual could not work at occupations that would require repetitive use of the hands, and those that would require working in the public or in close proximity or cooperation with others.  The VE testified that, given the Plaintiff's social limitations, she was not capable of performing any of her past employment, but that light jobs such as a courier or messenger would accommodate those limitations.

The VE further testified that there were approximately 2,500 jobs in Cook County and Lake County as a parking lot cashier, and 750 jobs as a locker room attendant, both of which had minimal contact with the public.  The Plaintiff did not pose any questions to the VE.

**E.      ALJ's Opinion**

---

[11] The Regulations define "light work" in the following manner:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

On July 28, 2004, the ALJ issued a decision denying benefits to the Plaintiff. The ALJ determined that the Plaintiff suffered from plantar fascitis, depression, and anxiety, which qualified as severe impairments. However, the ALJ found that the Plaintiff's allegations regarding her limitations were "not fully credible." R. at 18. The ALJ ultimately found the Plaintiff to have an RFC to "perform light work, performing postural activities only on an occasional basis, but no work involving repeated hand use, public contact, or close proximity to co-workers." R. at 18. Further, the ALJ found that the Plaintiff had the residual capacity to perform a "significant range of light work," and, based on VE testimony, that the Plaintiff could make a "vocational adjustment" and perform a significant number of jobs in the national economy. R. at 17. Using Medical-Vocational Rule 202.21 as a framework, the ALJ concluded that the Plaintiff was not disabled and not entitled to benefits at Step Five because she could perform work as a messenger, parking attendant, locker attendant, and inspector.

## F.    September 12, 2006 Opinion and Order

On September 12, 2006, the Court denied Plaintiff's Memorandum in Support of Summary Judgment or Remand and reaffirmed the ALJ's decision in all respects.

## STANDARD

Federal Rule of Civil Procedure 59(e) provides that, "[a]ny motion to alter or amend judgment shall be filed no later than 10 days after entry of the judgment", Fed.R.Civ.P. 59(e), which the Plaintiff did here.[12]  As to the substance, a Rule 59(e) motion is properly granted if there has been a mistake of law or fact. *Dixon v. Barnhart*, No. 02 C 6410, 2004 WL 2931324, at *1 (N.D. Ill. Dec. 14, 2004) (citing *Figgie, Int'l, Inc. v. Miller*, 966 F.2d 1178, 1180 (7th Cir. 1992)).  Rule

---

[12]The Commissioner does not challenge the timing of Plaintiff's Motion.

59(e) allows the district court to "correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Dixon*, 2004 WL 2931324, at *1 (citing *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995)). However, Rule 59(e) motions do not give a party the opportunity to rehash old arguments or to present new arguments "that could and should have been presented to the district court prior to the judgment." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996) (citing *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir.1995)). Rather, a Rule 59(e) motion "must clearly establish either a manifest error of law or fact or must present newly discovered evidence" in order to be successful. *LB Credit Corp.*, 49 F.3d at 1267 (quoting *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)). Explained in further detail, a motion for reconsideration is appropriate when:

> the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court.

*Dixon*, 2004 WL 2931324, at *2 (quoting *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). Finally, the decision of whether to grant or deny a Rule 59(e) motion "is entrusted to the sound judgment of the district court...." *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

## ANALYSIS

In the instant Motion, the Plaintiff requests an order from the Court amending or altering its September 12, 2006 Opinion and Order, which denied Plaintiff's request for remand and reaffirmed the ALJ's decision in all respects. In support, the Plaintiff asserts that the Court failed to address two of her arguments requesting remand, specifically (1) that the ALJ erred in failing to engage in

an adequate mental RFC analysis after concluding that Plaintiff suffered from severe mental impairments, and (2) that the Commissioner failed to meet its burden at step five.

The Court will address the Plaintiff's arguments in turn and in more detail below. However, as a threshold point, the Court notes that it did misapprehend the Plaintiff's arguments as to the mental RFC and the ALJ's step five analysis and therefore did not directly address those issues in its September 12, 2006 Opinion and Order. The Court will do so now.

## A.  Mental RFC[13]

The Plaintiff argues that the ALJ failed to make a mental RFC finding despite concluding that she suffered from severe depression and anxiety impairments. The Plaintiff argues that even if the ALJ correctly found that her severe mental impairments did not meet or equal a listed impairment at step three, the ALJ was required to continue his analysis and assess the claimant's mental RFC. *See* 20 C.F.R. § 404.1520a. Plaintiff contends that the ALJ failed to satisfy this requirement.

The Court agrees with the Plaintiff's analysis and relies on SSR 96-8p, which provides that when an individual is not engaged in substantial gainful activity and the ALJ determines that the individual has a severe impairment that does not meet or equal the requirements of any impairment in the Listing of Impairments, the ALJ must continue with an assessment of the individual's RFC.

---

[13]Because the Court has already once recited this language, it only provides an abridged summary of the RFC: "Residual functional capacity" is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. *See* 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The RFC is an issue at steps 4 and 5 of the sequential evaluation process. *See* Social Security Ruling 86-8p ("SSR 86-8p"). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.*

*See* Social Security Ruling 96-8p, 1996 WL 374184, at *1.[14]  SSR 96-8p continues:

> The psychiatric review technique described in 20 C.F.R. 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

*Id*. at *4.  Here, upon further review of the ALJ's analysis of the Plaintiff's mental limitations, the

ALJ identified the limitations in paragraphs "B" and "C" at steps 2 and 3.  However, as SSR 96-8p

states, this is not an RFC assessment.  The ALJ is required to then continue beyond steps 2 and 3

and conduct an RFC evaluation, which requires "a more detailed assessment by itemizing various

functions contained in the broad categories found in paragraphs B and C of the adult mental

disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."  *Id.*

Listing of Impairment 12.00, paragraphs B and C are respectively titled "Need for Medical

Evidence" and "Assessment of Severity."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The paragraphs list

a number of symptoms and criteria for an ALJ to consider in making an assessment of a possible

mental disorder.  For example, the paragraphs direct ALJs to consider criteria such as "activities of

daily living; social functioning; concentration, persistence, or pace; and episodes of

---

[14]To the extent that this finding conflicts with this Court's September 12, 2006 Opinion and Order, the instant Opinion and Order supersedes.

decompensation" and to look for symptoms such as "abnormalities of behavior, mood, thought, memory, orientation, development or perception." *Id*.

In this case, the ALJ failed to engage in a detailed analysis to the extent required by the regulations. In his RFC finding, the ALJ held that:

> The claimant retains the [RFC] to perform light work, or work involving a maximum lifting up to 20 pounds, performing postural activities only on an occasional basis. The claimant's capacity to perform the full range of light work is limited by no repetitive hand use, working in public, or in close proximity with co-workers.

R. at 16. The Court finds that the ALJ did not consider the itemized functions listed in Impairment 12.00 as required by the Regulations. The ALJ failed to consider any of the criteria or symptoms listed in Listing of Impairment 12.00, paragraphs B and C. Accordingly, the Court finds that remand is appropriate on this narrow issue and orders the ALJ to perform a thorough and complete mental RFC analysis in compliance with the regulations, in particular 20 C.F.R. § 404.1520a and SSR 96-8p.

### B. Step five and SSR 00-4p

Next, the Plaintiff argues that because she was unrepresented at the hearing, the ALJ had a "heightened duty to elicit VE testimony sufficient to substantiate the Commissioner's ultimate finding at step five." Plaintiff's Mot. Alter or Amend Judgment at 7. Plaintiff argues that the ALJ partially complied with SSR 00-4p, which sets forth guidelines for the use of VE testimony, but did not meet the heightened burden resulting from her *pro se* status.

SSR 00-4p requires an ALJ who takes testimony from a VE about the requirements of a particular job to determine whether that testimony is consistent with the Dictionary of Occupational

Titles ("DOT").  More specifically, SSR 00-4p provides:

> When a VE or VS provides evidence about the requirements of a job
> or occupation, the adjudicator has an affirmative responsibility to ask
> about any possible conflict between that VE or VS evidence and
> information provided in the DOT.  In these situations, the adjudicator
> will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts
> with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the
> adjudicator will obtain a reasonable explanation for the apparent
> conflict.

SSR 00-4p, 2000 WL 1898704, at *4.  In *Prochaska v. Barnhart*, a case cited by and relied upon by

the Plaintiff here, the ALJ heard testimony from a VE as to the plaintiff's limitations but did not ask

whether the VE's analysis conflicted with the DOT.  454 F.3d 731 (7th Cir. 2006).  The Seventh

Circuit concluded that the plaintiff "was not required to raise this issue at the hearing, because [SSR

00-4p] places the burden of making the necessary inquiry on the ALJ."  *Id.* at 735.  In other words,

the ALJ bears the burden to inquire as to any possible conflicts between the VE's testimony and the

DOT.

Here, unlike in *Prochaska*, as the Plaintiff admits, the ALJ inquired at the January 7, 2004

hearing as to whether the VE's testimony conflicted with the DOT.  *See* R. at 43 (after posing a

hypothetical question to the VE, the ALJ asked the following:  "Q[uestion]: Has your testimony

been consistent with the DOT and SCO?  A[nswer]: Yes, it has.").  In the Court's view, the ALJ's

question satisfies the requirement spelled out in SSR 00-4p and clarified in *Prochaska* that an ALJ

must ask a VE if the evidence he or she provided conflicts with information provided in the DOT.

Furthermore, SSR 00-4p only requires "a reasonable explanation" as to an apparent conflict

"[i]f the VE's or VS's evidence appears to conflict with the DOT... ."  SSR 00-4p, 2000 WL

1898704, at *4.  Here, the ALJ asked the VE if his testimony was consistent with the DOT, to which he responded in the affirmative.  *See* R. at 43.  Thus, from the ALJ's perspective and based on the VE's testimony, no conflict existed between the VE's testimony and the ALJ.  The ALJ was entitled to rely on the VE's testimony in reaching his conclusion at step five.  Accordingly, the Court finds that the ALJ had no duty to inquire further.  *See Lembke v. Barnhart*, No. 06-C-0306-C, 2006 WL 3834104, at *15 (W.D. Wis. Dec. 29, 2006) ("Hearing the VE's affirmative response [that his testimony was consistent with the DOT], the ALJ had no obligation under SSR 00-4p to inquire further").  Therefore, the Court finds that the ALJ complied with SSR 00-4p and *Prochaska*.

The Court disagrees with Plaintiff's assertion that because she proceeded *pro se* at the hearing the ALJ had a heightened duty to elicit additional testimony from the VE.  The Court finds Plaintiff's argument unavailing for two reasons.  First, the Plaintiff cites no case law in support of her assertion that an ALJ has a "heightened duty" in such a situation and there is no support for such a duty in SSR 00-4p.  Second, because SSR 00-4p places the "affirmative responsibility" to resolve any possible conflicts between the VE's evidence and information provided in the DOT squarely upon the ALJ, whether or not a claimant is represented by counsel is immaterial for the purposes of an ALJ's duty under SSR 00-4p.  *See* SSR 00-4p, 2000 WL 1898704, at *4; *Prochaska*, 454 F.3d at 735.  In other words, the ALJ, not the Plaintiff, bears the duty to comply with SSR 00-4p regardless of whether the claimant has counsel or is proceeding *pro se*.  *See Prochaska*, 454 F.3d at 735 (providing that a claimant "was not required to raise this issue [i.e., the possibility of a conflict between the VE's testimony and the DOT,] at the hearing, because the Rule places the burden of making the necessary inquiry on the ALJ").

## CONCLUSION

20

Based on the foregoing, the Court now **GRANTS** the Plaintiff's Motion to Alter or Amend Judgment Pursuant to Fed.R.Civ.P. 59(e) [DE 31] and **REMANDS** this matter for further administrative proceedings consistent with this Opinion and Order.

SO ORDERED this 18th day of July, 2007.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record

21